# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| **KENNETH STEPHENS,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **vs.** | )     **Case number 4:04cv0195 TCM** |
| | ) |
| **MIKE KEMNA,** | ) |
| | ) |
| **Respondent.** | ) |

## MEMORANDUM AND ORDER

The 28 U.S.C. § 2254 petition of Kenneth Stephens, a Missouri prisoner, for federal habeas corpus relief is before the undersigned, pursuant to the parties' written consent, for a final disposition. See 28 U.S.C. § 636(c).

## Background

Kenneth Stephens ("Petitioner") was charged with, and then indicted on, one count of first degree murder, two counts of first degree assault, and three counts of armed criminal action. (Resp. Ex. 2 at 7-11.) He was also charged as a prior and persistent offender. (Id. at 11.)

His jury trial on those charges began on July 6, 1998. (Resp. Ex. 1 at 1.) The first witness to testify was a man, Ron Jackson, who had been at Sanford's Restaurant and Lounge ("Sanford's") in the early morning hours of August 8, 1997. (Id. at 160-61.) He was standing in the parking lot and talking with Angela Brown when he heard a series of gunshots. (Id. at 162-63.) He saw a man run outside the door, down a hill, and get into

the passenger side of a white Mustang convertible. (<u>Id.</u> at 163-64.) The car then drove off at a high speed. (<u>Id.</u> at 165.) Ms. Brown told Jackson that she knew the man who had run off; he had just given her his phone number. (<u>Id.</u> at 179.) Patricia Robinson was also at Sanford's that night. (<u>Id.</u> at 181.) She and a friend, Juanita, were sitting in a car getting ready to go into the restaurant when a white Mustang pulled up behind them. (<u>Id.</u> at 182.) She saw a man get out of the Mustang and kick the restaurant door. (<u>Id.</u>) The man had two guns in his hand. (<u>Id.</u> at 182, 188, 190.) She saw and heard a lot of shots. (<u>Id.</u> at 182-83.) After the shots stopped, she saw the man walk "real fast" out of the restaurant, get into the passenger side of the Mustang, and drive off. (<u>Id.</u> at 183.)

Juanita Fitz was sitting in her car with Ms. Robinson when she saw a white Mustang pull up in front of Sanford's. (<u>Id.</u> at 350-51.) The man walked in to Sanford's with two guns and started shooting. (<u>Id.</u> at 351.) After the shooting stopped, he returned to the passenger side of the Mustang and got in. (<u>Id.</u> at 352-53.) The car quickly left. (<u>Id.</u> at 353.) She recognized the man as someone who used to come to the bar; his name was Ken. (<u>Id.</u> at 354.) She identified Petitioner as the man. (<u>Id.</u> at 354-55.) She initially told the police she did not know who the shooter was because she was afraid. (<u>Id.</u> at 355.) On cross-examination, she further revealed that the police gave her a lie detector test because they did not believe she was telling the truth. (<u>Id.</u> at 361.) She knew who Petitioner was because she had served him drinks when he was a patron of Sanford's and she was working there. (<u>Id.</u> at 363.) She had been shown photographs and identified photographs given her by counsel as the ones she had been shown. (<u>Id.</u>) She knew Petitioner because

he had been a patron.  (Id.)  He had also been a patron of another bar owned by Sanford's owner, and she had served him when she worked there also.  (Id. at 364-65.)

Ms. Brown testified that a man identifying himself as "Ken" approached her outside of Sanford's that early morning and, after talking with her a few minutes, asked her for her telephone number.  (Id. at 194.)  She did not give him her number, but he wrote his in her book.  (Id.)  Shortly thereafter, she saw him talking with the guard.  (Id. at 195.)  The guard was telling him that he could not get in without an ID.  (Id.)  She decided to leave approximately fifteen minutes later and was standing in the parking lot talking with Jackson when she heard gunshots.  (Id. at 196-97.)  She saw a man get into a white Mustang and told Jackson that the man was the one who had given her his telephone number.  (Id. at 197-98.)  In the courtroom, she identified Petitioner as the man who gave her his number and was talking with the guard that night.  (Id. at 204-05, 248.)

Charlie Harris was also at Sanford's in the early morning hours of August 8.  (Id. at 250.)  Harris heard a man try to talk the guard into letting him in to Sanford's without an ID.  (Id. at 251-52.)  The guard refused and was escorting the man out when the man told him that he would beat the guard if the guard did not have a gun; the man said he was a boxer.  (Id. at 253.)  Later on, Harris was leaving Sanford's when he saw the man coming in.  (Id. at 255.)  The man raised both hands; he had a gun.  (Id. at 255, 281.)  Harris turned to run, but was shot eight times.  (Id. at 255.)  He fell to the floor and tried to crawl.  (Id. at 256.)  He was shot again.  (Id.)  All total, he was shot seventeen times.  (Id.)  The man who shot him was the man he had seen earlier fighting with the guard, Marvin.  (Id.

at 257, 262.) Harris identified Petitioner as the man who shot him, the guard, and a third man. (<u>Id.</u> at 262-63.) The third man was someone who had tried to help Harris and got shot in the foot. (<u>Id.</u> at 266.) The third man was Richard Horton. (<u>Id.</u> at 293-94.)

Over the objection of Petitioner's trial counsel, Thomas Sharp was the next witness to testify. (<u>Id.</u> at 313-18.) On August 6, 1997, Sharp lived at 5840 Ferris Avenue in the City of St. Louis. (<u>Id.</u> at 318.) He had known Petitioner for ten or twelve years. (<u>Id.</u> at 319.) After midnight on the sixth, he saw Petitioner pull up to his house in a black car. (<u>Id.</u>) The two men talked; Petitioner left. (<u>Id.</u>) Petitioner later came back to the side of his house. (<u>Id.</u> 320.) Petitioner had a short shotgun and a nine millimeter automatic or semiautomatic weapon. (<u>Id.</u>) He fired those guns at the house. (<u>Id.</u> at 321.) The police collected the spent bullets and casings. (<u>Id.</u>) Petitioner, whose family lived around the corner, had had a long-standing argument with Thomas' brother Rodney about money Rodney allegedly owed Petitioner. (<u>Id.</u> at 323.) At the time of the shooting, Sharp and his niece LaTonya Young were sitting on the porch; both ran when the shooting started. (<u>Id.</u> at 326-29.) Ms. Young testified, over trial counsel's objection, that on the night of August 6 she was sitting on the porch at 5840 Ferris Avenue with her uncle Thomas when a man with two guns approached from the side of the house. (<u>Id.</u> at 374.) One gun was a nine millimeter, the other was "like a" big shotgun. (<u>Id.</u>) The man shot the weapons both inside and outside the house. (<u>Id.</u> at 374-75.) He called for Rodney Sharp to come outside. (<u>Id.</u> at 382.) She identified Petitioner as that man. (<u>Id.</u> at 376-77.)

A ballistics officer "compared the spent shell casings and shotgun slugs from the incident at 5840 Ferris and from the incident at [Sanford's and] concluded that the shell casings had been fired from the same nine millimeter gun, and that the shotgun slugs were of about equal weight." (Resp. Ex. 5 at 2-3.) A forensic pathologist testified that Marvin Williams had been shot once in the left side of his abdomen, twice in his left leg, and once in his right leg. (Id. at 452.) The gunshot wound to his abdomen hit an artery and caused his death. (Id. at 460-61.)

Petitioner introduced the testimony of seven witnesses and his own testimony. The first witness was Paula Caldwell. (Id. at 512.) In August 1997, Petitioner lived with her. (Id.) After she learned of the shooting at Sanford's she tried to remember where Petitioner was at that time. (Id. at 512-13.) He was with her at home. (Id. at 513.) When she went to bed around 10 or 10:30 that night, he was laying in bed looking at the television. (Id. at 514, 515.) When she woke up around 4:30 in the morning, he was laying in bed looking at television. (Id. at 514.) On cross-examination, Ms. Caldwell explained that she knew Petitioner was at home the night of August 7 because that was where he usually was. (Id. at 520.) The night of August 7 had no significance until the police came looking for Petitioner 13 days later. (Id. at 523.) Petitioner was not there then, and did not return afterwards. (Id.) She could not recall when he had left, but it was after he had been in an altercation with the municipal police. (Id. at 524, 526.)

A detective with the St. Louis Metropolitan Police Department, Byron Harrington, testified that he interviewed Ms. Robinson and Ms. Fitz after the shooting at Sanford's.

(Id. at 537-38, 541.) Trial counsel's attempts to elicit information from Detective Harrington that he had gained through the interviews were successfully objected to. (Id. at 541-42, 548-51.) Kevin Jefferson testified that he was working as a photographer at Sanford's the night of August 7 when he saw a man arguing with Marvin. (Id. at 554.) He attempted to intervene and told Marvin he did not need to argue. (Id.) Marvin pushed his hand and swore at him not to get involved. (Id.) He had "just . . . a glance" of the man fighting with Marvin, but it did not appear to be Petitioner. (Id. at 557.) On cross-examination, he testified that the man arguing with Marvin could or could not have been Petitioner. (Id. at 564.)

Police officer Robert Jordan briefly testified, as did Carl Nicholson, another Sanford's patron who had a glance at the man arguing with Marvin the night of the shooting. (Id. at 567-73, 574-80.) Petitioner next called a hostile witness, Iesha Mitchell, who denied being at Sanford's when Marvin was shot and denied ever having told trial counsel that she had been. (Id. at 611-25.)

Petitioner testified that he might have given Ms. Brown his telephone number, but he did not the night of the shooting because he was not there. (Id. at 627-28.) He would drive by the house on Ferris if he was visiting his mother; however, he never stopped in front. (Id. at 629-30.) The night of August 6, he did not drive up to the Sharps' house and ask Thomas where Rodney was. (Id. at 630.) Rodney owed him money, but he was not concerned about it and would not shoot anyone for the amount Rodney owed, approximately 30 dollars. (Id. at 631.) He was with his girlfriend the night of August 6

and was not at the Sharps'. (<u>Id.</u> at 633.) He was also at home the night of August 8. (<u>Id.</u> at 633-34.) He did not shoot anyone at Sanford's or at the Sharps' house. (<u>Id.</u> at 636-37, 647.)

Petitioner further testified that he once owned a white Mustang. (<u>Id.</u> at 639-40.) He bought it from a man but never had the title changed. (<u>Id.</u> at 640.) He then sold it to his cousin, Reginald Jones. (<u>Id.</u>) He had seen Reginald's cousin Donald Jones drive the Mustang. (<u>Id.</u> at 641-42.) He had never owned a nine millimeter gun. (<u>Id.</u> at 642.)

On cross-examination, Petitioner explained that the witnesses who had identified him as being at Sanford's that night were lying, probably after being coerced or paid by police. (<u>Id.</u> at 652, 659-63, 665-67, 676.) Thomas Sharp and Ms. Young told his friends that they shot up their own house to get him off the streets. (<u>Id.</u> at 668.)

Petitioner's last witness was a photographer who testified about pictures he took of Sanford's and its relationship to certain parking lots. (<u>Id.</u> at 685-706.)

Shortly after beginning his closing argument, the prosecutor told the jury:

> The burden of proof, I told you it was mine the whole way. That means I have to produce evidence in my case in chief that convinces you beyond a reasonable doubt he did what we said he did, killed and assaulted people.
>
> That was proven. The defense offered nothing that diminished it. The pictures didn't diminish it. Certainly the arrogant testimony and conspiratorial theory given by the defendant didn't diminish it. So we've met our burden.
>
> The important thing is it's proof beyond a reasonable doubt. . . .

(<u>Id.</u> at 721.)

Somewhat later, he talked to the jury about deliberation:

> The defendant did so [shot Marvin Williams] after deliberation, which means cool reflection upon the matter for any length of time, no matter how brief. No matter how brief. That's a millisecond, that's two seconds.
>
> What are we talking about in deliberation? We're talking about the ability to have choices. The ability to make decisions. That's when you utilize cool reflection. . .

(Id. at 724.) The prosecutor then outlined the decisions made by Petitioner, including the decision to drive the Mustang that night and not the car he usually drove, the decision to get his guns, and to "pull his guns and fire." (Id. at 726.) These remarks were objected to by Petitioner.

Less than two hours after retiring to deliberate, the jury returned a verdict of guilty on each of the six charges. (Resp. Ex. 2 at 4.) Petitioner was sentenced as a prior and persistent offender to life imprisonment without probation or parole on the first degree murder conviction and 30 years' imprisonment on each of the remaining charges, with each sentence to run concurrently to the others. (Id. at 96-98.)

Petitioner appealed on three grounds: he was denied due process and a fair trial when the trial court (1) permitted the State to introduce evidence of the August 6 incident; (2) permitted the prosecutor to "misdefine the term 'deliberation' during closing argument," thereby lessening the State's burden of proof on a crucial element of its case; and (3) permitted the prosecutor to argue that the State had met its burden of proof because the defense had not "'diminish[ed]'" the State's evidence. (Resp. Ex. 3 at 8-10.) The appellate court concluded that the first ground was without merit, finding as follows:

The prosecution presented evidence that defendant had shot up a house at 5840 Ferris Avenue two nights before the shooting at the bar. The homeowner, who had known defendant ten or twelve years, identified defendant as the shooter and indicated that defendant had had two guns, a nine millimeter and a "short" shotgun. The ballistics officer who compared the spent shell casings and the shotgun slugs from the incident at 5840 Ferris and from the incident at the bar concluded that the shell casings had been fired from the same nine millimeter gun, and that the shotgun slugs were of about equal weight.

Generally, evidence of prior uncharged misconduct is inadmissible for the purpose of showing the propensity of a defendant to commit crimes of that nature. However, such evidence is admissible if the evidence is logically relevant, in that it has some legitimate tendency to establish directly the accused's guilt of the charges for which he is on trial, and if the evidence is legally relevant, in that its probative value outweighs its prejudicial effect.

. . .

In this case defendant made an issue of his identity as the shooter. Defendant maintained he was not at the scene of the murder and attempted to discredit all eyewitnesses who placed him at the scene. The ballistics evidence coupled with the eyewitness testimony from the prior shooting was therefore relevant to establish defendant's identity as the shooter in the murder. The evidence relating to the prior shooting tended to prove defendant's access to the two weapons employed in the murder and his identity as the perpetrator. The requisite degree of relevancy is clear.

(Resp. Ex. 5 at 2-3.) (Interim citations omitted.) (Alteration added.)

Noting that Petitioner had not objected to the prosecutor's closing remarks, the appellate court found that neither his second nor third argument raised the required substantial ground for plain error review. (Id. at 4.) Both were denied. (Id.)

Petitioner then sought post-conviction relief pursuant to Missouri Supreme Court Rule 29.15. (Resp. Ex. 7 at 1.[1]) Rodney Sharp, Petitioner, and Petitioner's trial counsel testified at an evidentiary hearing. (Resp. Ex. 6.) Rodney Sharp testified that he had known Petitioner for approximately 25 years. (Id. at 3.) He was in the house on Ferris when it was shot at and did not know who had done it. (Id.) He could not recall ever having borrowed money from Petitioner. (Id. at 4.) He would have testified at Petitioner's trial if he had been available; he had been incarcerated for the last few years. (Id.) Asked on cross-examination about receiving two deposition subpoenas a special process server had said had been served on him, Mr. Sharp denied ever receiving either. (Id. at 5-6.) He could not say Petitioner had not shot at the house because he did not see anyone fire any shots. (Id. at 8-9.) He did not think his brother was there and did not know if his niece was. (Id. at 9.) He did not know who was outside the house; he did not see anything. (Id. at 10.)

Petitioner testified that he thought Rodney Sharp would have been called as a witness by his attorney because it was his debt that was allegedly the motive for the shooting at the Ferris house. (Id. at 17.) Without that shooting, Petitioner would never have been linked to the murder because there were no witnesses to that.[2] (Id. at 18.) Petitioner never talked to his trial counsel about Rodney Sharp. (Id. at 23.) Trial counsel

---

[1]The Court notes that the postconviction proceedings legal file submitted by Respondent as an exhibit is missing several pages. There is no question, however, of a procedural default at this stage of the proceedings, and the relevant documents are complete.

[2]Asked about Ms. Brown and Ms. Fitz, Petitioner noted that neither initially identified him.

testified, inter alia, that she subpoenaed Rodney Sharp to appear for a deposition, but he did not; as part of her trial strategy, she asked Ms. Fitz about the lie detector test to make her seem unreliable and less credible; and she asked Ms. Fitz about the photographic lineup because Petitioner wanted her to.  (Id. at 36-39, 46-47, 55.)  In hindsight, the questions to Ms. Fitz might have bolstered her credibility.  (Id. at 56.)

The motion court found that there was no reasonable probability that (1) Rodney Sharp's cursory, "less than credible" testimony would have created a viable defense; (2) the outcome of the trial would have been different without trial counsel's limited questioning of Ms. Fitz about the lie detector test; and (3) the outcome of the trial would have been different had trial counsel not questioned Ms. Fitz about the set of photographs, "given the number of eyewitnesses who identified [Petitioner] as the shooter and the relative insignificance of the issue to the entire case."  (Id. at 36-38.)

Petitioner appealed, again on three grounds:  trial counsel was ineffective for (1) not locating and calling Rodney Sharp; (2) trying to impeach Ms. Fitz with the question about the lie detector test; and (3) trying to impeach her with the question about the set of photographs.  (Resp. Ex. 8 at 13-17.)  The appellate court rejected each as meritless, finding, in part, that trial counsel's questions to Ms. Fitz (a) were a matter of trial strategy and (b) did not prejudice Petitioner.  (Resp. Ex. 10 at 7-9.)

Petitioner now seeks habeas relief on the six grounds presented to the appellate court in his two appeals.  Respondent counters that four are without merit and two, the challenges to the prosecutor's closing argument, are procedurally barred and without merit.

**Discussion**

Standard of Review. Title 28 U.S.C. § 2254(d) mandates that a federal court "not grant habeas relief on a claim that was adjudicated on the merits in state court unless 'it resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,'" **James v. Bowersox**, 187 F.3d 866, 869 (8th Cir. 1999) (quoting § 2254(d)(1)), or it "'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding,'" **Evans v. Rogerson**, 223 F.3d 869, 871 (8th Cir. 2000) (quoting § 2254(d)(2)). See also **Weaver v. Bowersox**, 241 F.3d 1024, 1029 (8th Cir. 2001) ("Section 2254(d) distinguishes between two types of erroneous decisions – those of law and those of fact[.]").

The "contrary to" clause and the "unreasonable application" clause have independent meanings. **Williams v. Taylor**, 529 U.S. 362, 405 (2000). "[A] state court decision is 'contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or 'if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [their] precedent.'" **Lockyer v. Andrade**, 538 U.S. 63, 73 (2003) (quoting Williams, 529 U.S. at 405-06) (alterations added). "On the other hand, a run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." **Williams**, 529 U.S. at 406

(alteration added). Thus, a state court decision that correctly identifies the controlling legal authority and, applying that authority, rejects a prisoner's claim does not fit within the "contrary to" clause although it might be contrary to a federal court's conception of how that authority ought to be applied in that particular case. **Id.**

Such a state court decision can, however, fit within the "unreasonable application" clause. **Id.** at 407-08. "[W]hen a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case, a federal court applying § 2254(d)(1) may conclude that the state-court decision falls within that provision's 'unreasonable application' clause." **Id.** at 409 (alterations added). "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." **Id.** (alteration added). When making this inquiry, a federal habeas court should note that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." **Id.** at 410. "It is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous." **Lockyer**, 538 U.S. at 75 (internal quotations omitted). And, "'[t]o the extent that inferior federal courts have decided factually similar cases, reference to those decisions is appropriate in assessing the reasonableness . . . of the state court's treatment of the contested issue.'" **Copeland v. Washington**, 232 F.3d 969, 974 (8th Cir. 2000) (quoting Long v. Humphrey, 184 F.3d 758, 761 (8th Cir. 1999)) (alterations in original). Additionally, "the [state courts'] 'summary nature' of the discussion of [a] federal constitutional question does not

preclude application of the AEDPA standard." **Brown v. Luebbers**, 371 F.3d 458, 462 (8th Cir. 2004) (alterations added).

Ground One:  Evidence of Another Crime.  Petitioner first argues that his rights to due process and a fair trial were violated by the admission of evidence about the shooting at the house on Ferris street two days before the shooting at Sanford's.

"[I]n habeas corpus proceedings, it is not within [the federal courts'] province to 'reexamine state-court determinations on state-law questions.'" **Johnston v. Luebbers**, 288 F.3d 1048, 1056 (8th Cir. 2002) (quoting Estelle v. McQuire, 502 U.S. 62, 67-68 (1991)) (alterations added).  See also **Taylor v. Bowersox**, 329 F.3d 963, 968 (8th Cir. 2003) ("A state's interpretation of its own law is virtually unreviewable by a federal court.").  Thus, "'[a] state court's evidentiary rulings can form the basis for habeas relief under the due process clause only when they were so conspicuously prejudicial or of such magnitude as to fatally infect the trial and deprive the defendant of due process.'" **Osborne v. Purkett**, 411 F.3d 911, 917 (8th Cir. 2005) (quoting Parker v. Bowersox, 94 F.3d 458, 460 (8th Cir. 1996)) (alteration added).  Accord **Rousan v. Roper**, 436 F.3d 951, 958-59 (8th Cir. 2006); **Amrine v. Bowersox**, 238 F.3d 1023, 1032-33 (8th Cir. 2001); **Bounds v. Delo**, 151 F.3d 1116, 1119 (8th Cir. 1998).  "[T]his due process standard mandates a greater showing of prejudice than is needed to support a finding of plain error on appeal."  **Griffin v. Delo**, 33 F.3d 895, 905 (8th Cir. 1994) (alteration added).  Consequently, federal habeas review of an alleged due process violation in a state court conviction is narrow.  **Anderson v. Goeke**, 44 F.3d 675, 679 (8th Cir. 1995)

In the instant case, the Missouri Court of Appeals noted that "[g]enerally, evidence of prior uncharged misconduct is inadmissible for the purpose of showing the propensity of the defendant to commit crimes of that nature."  (Resp. Ex. 5 at 3.)  The court further noted that such evidence was admissible if "logically relevant. . . . and legally relevant." (Id.)  The evidence at issue "tended to prove [Petitioner"s] access to the two weapons employed in the murder and his identity as the perpetrator."  (Id.)

In **Rainer v. Department of Corrections**, 914 F.2d 1067, 1071 (8th Cir. 1990), the Eighth Circuit found no due process violation in the admission at the petitioner's state criminal trial on murder charges of evidence of prior misconduct although that misconduct had occurred years before the murder.  See also **Poole v. Wood**, 45 F.3d 246, 250 (8th Cir. 1995) (finding no due process violation in admission of evidence of 1979 sexual contact with 14-year old relative in trial of doctor charged with criminal sexual conduct committed against female patients between 1987 and 1990); **Mercer v. Armontrout**, 844 F.2d 582, 586-87 (8th Cir. 1988) (finding no due process violation in admission of prior prosecution as evidence of motive and noting that trial court had found that the prejudicial effect of the evidence did not outweigh its probative value); **Wedemann v. Solem**, 826 F.2d 766, 767-78 (8th Cir. 1987) (finding no due process violation in admission of evidence of fires occurring in 1973, 1976, and 1977 on properties owned by petitioner on trial for 1981 arson).

The evidence that Petitioner had used the same nine millimeter gun and a shotgun with similar-weight slugs two days before the shooting at Sanford's was clearly relevant

to establish him as the assailant when his identity was the crucial issue at trial. Petitioner's first ground is without merit.

Grounds Two and Three: Prosecutorial Misconduct. Petitioner next challenges the prosecutor's comments during closing argument defining "deliberation" and remarking about the defense not "diminish[ing] the State's evidence. The state appellate court declined to reach the merits of these claims because Petitioner had failed to object at trial.

"'Out of respect for finality, comity, and the orderly administration of justice, a federal court will not entertain a procedurally defaulted constitutional claim in a petition for habeas corpus absent a showing of cause and prejudice to excuse the default.'" **Cagle v. Norris**, — F.3d — (8th Cir. Jan. 24, 2007) (2007 WL 162732, *7) (quoting Dretke v. Haley, 541 U.S. 386, 388 (2004)). "'This rule is nearly absolute, barring procedurally-defaulted petitions unless a habeas petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or show actual innocence.'" **Id.** (quoting Reagan v. Norris, 279 F.3d 651, 652 (8th Cir. 2002)).

Petitioner has not shown any cause for his default. Petitioner fails to allege any cause for his procedural default. It is, therefore, unnecessary to consider whether he has demonstrated prejudice. See **Lee v. Kemna**, 213 F.3d 1037, 1039 (8th Cir. 2000); **Abdullah v. Groose**, 75 F.3d 408, 413 (8th Cir. 1996).

As noted above, Petitioner's defaulted ground might be reached on its merits absent a showing of cause for his procedural default if he establishes that a failure to do so will result in a fundamental miscarriage of justice. See **Forest v. Delo**, 52 F.3d 716, 719 (8th

Cir. 1995); **Flieger v. Delo**, 16 F.3d 878, 885 (8th Cir. 1994). The fundamental miscarriage of justice exception is applicable "when a petitioner makes a showing, based on new evidence, that a 'constitutional violation has probably resulted in the conviction of one who is actually innocent.'" **Brownlow v. Groose**, 66 F.3d 997, 999 (8th Cir. 1995). "The actual innocence exception is concerned with claims of actual, not legal, innocence." **Pitts v. Norris**, 85 F.3d 348, 350 (8th Cir. 1996). Petitioner makes no showing, based on new evidence,[3] that he is actually innocent.

Were Petitioner's claims not to be procedurally barred, they would nonetheless be unavailing because they are without merit. See **Kinder v. Bowersox**, 272 F.3d 532, 546 (8th Cir. 2001) (reviewing on merits claims that were not preserved for appellate review but were "gratuitous[ly]" reviewed for manifest injustice); **Stephens v. Norris**, 83 F.3d 223, 224 (8th Cir. 1996) (bypassing procedural bar and addressing simpler issue of merits when relief is denied).

When reviewing claims of prosecutorial misconduct during closing argument, "[t]he question . . . is 'whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" **Clemons v. Luebbers**, 381 F.3d 744, 757 (8th Cir. 2004) (quoting Darden v. Wainwright, 477 U.S. 168, 181 (8th Cir. 1986)) (alterations added). "Relief is available only if 'the prosecutor's closing argument was so inflammatory and so outrageous that any reasonable trial judge would have *sua*

---

[3]Insofar as Petitioner might argue that Rodney Sharp's testimony establishes his actual innocence, his argument is without merit for the reasons discussed below.

*sponte* declared a mistrial.'" **Id.** (quoting <u>James v. Bowersox</u>, 187 F.3d 866, 869 (8th Cir. 1999)). <u>Accord</u> **Hall v. Luebbers**, 341 F.3d 707, 716 (8th Cir. 2003)). This standard of review is "'a narrow standard of due process and not a broad exercise of supervisory power.'" **Pollard v. Delo**, 28 F.3d 887, 890 (8th Cir. 1994).

The jury was instructed that they must find that Petitioner acted with "deliberation" in order to find him guilty of first degree murder. (Resp. Ex. 1 at 58.) The instruction, a Missouri Approved Instruction, defined deliberation as "cool reflection upon the matter for any length of time no matter how brief." (<u>Id.</u>) "There is a presumption that jurors follow the court's instructions." **Underdahl v. Carlson**, 462 F.3d 796, 801 (8th Cir. 2006). "'The rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process.'" **United States v. Gardner**, 396 F.3d 991, 993 (8th Cir. 2005) (quoting <u>Richardson v. Marsh</u>, 481 U.S. 200, 211 (1987)). There is nothing in the record to indicate that the jury in Petitioner's case did not follow their instructions. <u>See</u> **Underdahl**, 462 F.3d at 801 (rejecting habeas petitioner's challenge to prosecutor's closing remarks asking jurors to think about abuse defendant's children had suffered in trial for witness tampering and perjury; jury had been properly instructed and petitioner had failed to rebut presumption that they had followed those instructions); **Feingold v. United States**, 49 F.3d 437, 439 (8th Cir. 1995) (concluding that there was no prosecutorial misconduct where prosecutor's remarks during closing argument touched

on the credibility of witnesses and argued that the defendant was guilty and where the jury was properly instructed that closing arguments are not evidence).

The jury was also instructed on the burden of proof and the definition of a reasonable doubt. (Resp. Ex. 1 at 57.) The prosecutor's remarks about the Petitioner failing to "diminish" the State's evidence did not imply any less of a burden or weaken the definition. Rather, the remarks were an argument to the jury that the evidence that Petitioner had placed before them had not weakened the State's evidence against him.

Additionally, the Court "examine[s] the totality of the circumstances in determining whether there is a reasonable probability that the error complained of affected the outcome" of the trial. **Preston v. Delo**, 100 F.3d 596, 602 (8th Cir. 1996) (alteration added). In the instant case, there is no such probability. Eyewitnesses identified Petitioner as the man who argued with a guard and then with two guns shot at least 21 times. "This is not a case where absent the allegedly improper comments, a jury reasonably could have reached a different outcome or where the improper remarks substantially bolstered the case against the defendant." **United States v. Samples**, 456 F.3d 875, 883 (8th Cir. 2006) (interim quotation omitted) (alterations added).

Grounds Four, Five and Six:  Ineffective Assistance of Trial Counsel. "The right to effective assistance of counsel 'is a fundamental right of criminal defendants; it assures the fairness, and thus the legitimacy, of our adversary process.'" **Smith v. Rogerson**, 171 F.3d 569, 572 (8th Cir. 1999) (quoting Kimmelman v. Morrison, 477 U.S. 365, 374 (1986)). "'The benchmark for judging any claim of ineffectiveness [of counsel] must be whether

counsel's conduct so undermined the proper functioning of the adversarial process that the [relevant proceeding] cannot be relied on as having produced a just result.'" **Jackson v. Gammon**, 195 F.3d 349, 354 (8th Cir. 1999) (quoting Kellogg v. Skon, 176 F.3d 447, 452 (8th Cir. 1999)) (first alteration added; second in original). "Only reasonable competence, the sort expected of the ordinary fallible lawyer, is demanded by the Sixth Amendment." **White v. Helling**, 194 F.3d 937, 941 (8th Cir. 1999) (internal quotations omitted). Moreover, "[t]here is a strong presumption that counsel's challenged actions or omissions were, under the circumstances, sound trial strategy." **Garrett v. Dormire**, 237 F.3d 946, 949-50 (8th Cir. 2001) (alteration added).

Petitioner argues he was denied the effective assistance of counsel when his trial counsel failed to locate and call Rodney Sharp as a witness and when she cross-examined Ms. Fitz about the lie detector test and the photographic lineup.

To establish that counsel's lack of competence violated the Sixth Amendment, the petitioner must show that counsel's performance was deficient and prejudicial. **Kellogg**, 176 F.3d at 452. To establish that counsel's performance was deficient, a petitioner must show that counsel "'made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" **Greiman v. Thalacker**, 181 F.3d 970, 971 (8th Cir. 1999) (quoting Strickland, 466 U.S. at 687). To establish prejudice, a petitioner must demonstrate "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" **Id.** (quoting Strickland, 466 U.S. at 697). "'A reasonable probability is a probability sufficient

to undermine confidence in the outcome.'" **Carroll v. Schriro**, 243 F.3d 1097, 1100 (8th Cir. 2001) (quoting Strickland, 466 U.S. at 694). The burden of showing a reasonable probability is the petitioner's. **Lawrence v. Armontrout**, 961 F.2d 113, 115 (8th Cir. 1992).

The question of prejudice from counsel's performance need not be reached if the performance was not deficient. See **Parkus v. Bowersox**, 157 F.3d 1136, 1140 (8th Cir. 1998). Conversely, the question of counsel's allegedly deficient performance need not be reached if a petitioner has failed to show prejudice. See **Strickland**, 466 U.S. at 697; **Hoon v. Iowa**, 313 F.3d 1058, 1061 (8th Cir. 2002); **Siers v. Weber**, 259 F.3d 969, 974 (8th Cir. 2001).

Petitioner can not show prejudice from any of the three alleged errors of his trial counsel.

First, Rodney Sharp's testimony was, at best, that he was at the house on Ferris the night of August 6 and that he did not see Petitioner. He did not testify that he saw the shooter and it was not Petitioner; rather, he testified that he did not see who the shooter was. Two other people there that night did see the shooter, and identified him as Petitioner. Also, there was no evidence that Rodney Sharp would have been available to testify. He ignored two subpoenas and was not sure if he was incarcerated at the time of trial. See **Middleton v. Roper**, 455 F.3d 838, 846-47 (8th Cir. 2006) (rejecting habeas claim that counsel was ineffective for failing to contact family members and former employers; petitioner "neglected to adduce evidence demonstrating trial counsel lacked

- 21 -

a strategic justification for not calling or investigating witnesses"); **United States v. Staples**, 410 F.3d 484, 488 (8th Cir. 2005) (concluding that counsel was not ineffective for not calling two witnesses to testify who would have been subject to impeachment and whose testimony would have been contradicted by eyewitness testimony); **United States v. White**, 341 F.3d 673, 680 (8th Cir. 2003) (finding that petitioner had not shown prejudice from counsel's failure to call witnesses whose testimony would not have been helpful or witness who would have been subject to impeachment had she testified differently than she had in earlier proceeding).

Nor can Petitioner show prejudice from trial counsel's questioning of Ms. Fitz. Ms. Fitz had served Petitioner when he was a patron of Sanford's and another bar and was, thus, familiar with him. And, she was not the only witness to identify him as the shooter. Ms. Brown and Mr. Harris also identified him. Other witnesses provided strong circumstantial evidence that he was the shooter.

### Conclusion

For the foregoing reasons, Petitioner's§ 2254 claims are without merit or are procedurally barred. Accordingly,

**IT IS HEREBY ORDERED** that the 28 U.S.C. § 2254 petition of Kenneth Stephens is **DENIED** without further proceedings.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III

THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this <u>20th</u> day of February, 2007.